# REDACTED

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 2:16cr126 |
| RONALD W. BOONE, SR. | ) | |
| a/k/a "Ronnie Boone" | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the criminal information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt, by proof of the following facts, among others:

### INTRODUCTION

1.     RONALD W. BOONE, SR. ("BOONE"), also known as "Ronnie Boone," is a lifelong resident of Norfolk, Virginia. For more than thirty-five years, BOONE has invested in real estate, operated a construction company, managed a real estate rental company, and owned and operated a local fishing pier as well as local restaurants. BOONE's operations focused primarily in the Ocean View area of Norfolk, Virginia. Almost all of BOONE's various companies were headquartered and operated out of 809 East Ocean View Avenue, Norfolk, Virginia.

2.     Branch Banking and Trust Company ("BB&T") was a bank that was established in 1872. BB&T is headquartered in Winston-Salem, North Carolina, and operates banking locations throughout the Hampton Roads, Virginia area. BB&T Bank is insured by the Federal Deposit Insurance Corporation.

1

3.     Fulton Bank, N.A. ("Fulton Bank") was established in 1882. Fulton Bank is headquartered in Lancaster, Pennsylvania, and operates banking locations throughout the Hampton Roads Area. Fulton Bank is insured by the Federal Deposit Insurance Corporation.

4.     Anthony Burfoot is a public official who has served as a City Councilman for Norfolk and as the Norfolk City Treasurer.

<p align="center">FACTS RELATED TO BANK FRAUD</p>

5.     From in or about September 2014 through in or about June 2016, in the Eastern District of Virginia and elsewhere, BOONE, and others known and unknown, did knowingly and unlawfully execute and attempt to execute a scheme and artifice to defraud a financial institution that is, Fulton Bank and BB&T Bank, financial institutions with deposits insured by the Federal Deposit Insurance Corporation, to obtain monies, funds, credits, assets, securities, and other property owned by and under the bank's custody and control by means of materially false and fraudulent pretenses, representations, and promises.

A.     BOONE's Banking Relationship With BB&T

6.     BOONE had a longstanding business relationship with BB&T Bank. In or about November 2011, BOONE obtained a $1,000,000 loan from BB&T Bank. BOONE pledged dozens of properties as collateral for the loan including, but not limited to, vacant lots located at          and          Pretty Lake Avenue, Norfolk, Virginia. BOONE's total lending relationship with BB&T totaled over $12.9 million.

7.     On or about October 1, 2014, BOONE contacted BB&T representatives, advised that he had an agreement to sell the lots located at          and          Pretty Lake Avenue, and asked what BB&T would require to release BB&T's liens on the properties.



<p align="center">2</p>

8.     On or about October 8, 2014, BOONE provided a document titled "Unimproved Lot Purchase Agreement" to BB&T as proof that he was selling two unimproved lots. The document purported to be a contract for BOONE to sell two vacant lots to buyers for $105,000.00; however, it was a false, fictitious and forged document. The buyers did not sign or initial this document, never agreed to purchase unimproved lots, and were unaware that BOONE had provided this document to BB&T.

9.     In reality and unbeknownst to BB&T Bank, BOONE had built a house on and     Pretty Lake Avenue. On or about October 4, 2014, BOONE had entered into a sales contract with the buyers to sell the house for $290,000. BOONE never provided the sales contract to BB&T and instead provided the fictitious, forged and fraudulent "Unimproved Lot Purchase Agreement" to assist the bank with determining a payoff amount.

10.     On or about October 17, 2014, a BB&T Representative, in reliance on the fraudulent "Unimproved Lot Purchase Agreement," sent a payoff statement to BOONE that contained terms for BB&T's release of its lien on     and     Pretty Lake Avenue. The document indicated that, in exchange for releasing its collateral interest in the properties, BB&T required BOONE to pay "90% of gross sales proceeds, but no less than $94,500.00" towards the loan.

11.     Shortly thereafter, BOONE, or someone at BOONE's direction, faxed a materially altered payoff statement to the buyers' settlement agent. Prior to sending the payoff statement, BOONE, or someone at BOONE's direction, altered the original payoff statement to either remove or hide BB&T's stipulation that it receive "90% of gross sales proceeds." As a result, the altered payoff statement gave the appearance that BB&T had agreed to release its

collateral in exchange for the fixed amount of $94,500. The buyers' settlement agent prepared the closing documents based on the materially altered payoff statement.

12.     On or about October 28, 2014, BOONE closed on the sale of the home that he had built on     and     Pretty Lake Avenue to the buyers for $290,000. BOONE did not sell an unimproved lot for $105,000. The HUD-1 settlement statement reflected the real purchase price, referenced BB&T's payoff of $94,500, and BOONE left the closing with proceeds from the sale totaling $167,444.

13.     On or about November 4, 2014, BB&T received a check totaling $94,500 from the buyers' settlement agent. Unbeknownst to BB&T at the time, this check was far less than 90% of the gross proceeds of the sale. Instead, BB&T should have received a check totaling $261,000.

14.     A short time later, a BB&T representative requested a copy of the HUD-1 settlement statement along with the accompanying payoff statement from the buyers' settlement agent. Upon receipt of these documents, the BB&T representative discovered BOONE's fraudulent misrepresentations. As a result of this and other conduct, BOONE's banking relationship with BB&T quickly deteriorated leaving BOONE in desperate need of alternative financing.

B.     <u>BOONE Defrauded Fulton Bank To Obtain A $13.2 Million Loan</u>

15.     In or about February 2015, BOONE requested a $13.2 million loan from Fulton Bank. The primary purpose of the loan was to refinance approximately $12.9 million in debt controlled by BB&T.

16.     BOONE did not disclose to Fulton Bank representatives that he had a strained banking relationship with BB&T Bank due to the submission of fraudulent documents. Instead,



4



it was represented to Fulton Bank representatives that BOONE was shopping for a new bank because he was dissatisfied with BB&T's customer service.

17.     From in or about February 2015 through August 2015, BOONE, or individuals at BOONE's direction, provided Fulton Bank with materially false and fraudulent documents and information to qualify for the multi-million loan. The materially false documents provided to Fulton Bank to obtain the loan included, but were not limited to, falsified personal financial statements, false tax returns, falsified cash flow statements, falsified lease agreements, inflated rent rolls, and fraudulently inflated bank statements.

18.     The primary purpose of the materially false documents and information was to substantially inflate BOONE's level of cash flow. While he had numerous properties to serve as collateral for the loan, BOONE also had to demonstrate sufficient liquidity to support the approximately $80,000 monthly loan payments.

19.     Relying on the material misrepresentations provided by BOONE, and others at his direction, Fulton Bank representatives ultimately approved a $13.2 million loan to BOONE and another borrower.

20.     On or about October 28, 2015, Fulton Bank closed the $13.2 million loan with BOONE. BOONE knowingly and intentionally procured this loan through false and fraudulent pretenses and used almost all of the fraudulent loan proceeds to satisfy his BB&T debt obligations. BOONE also left the closing with $49,400.39.

21.     From in or about October 2015 through in or about June 2016, BOONE continued to provide falsified information to Fulton Bank to satisfy his ongoing documentation obligations.

22.     To date, BOONE has remained current on his monthly payments to Fulton Bank.

## FACTS RELATED TO CONSPIRACY TO COMMIT HONEST SERVICES WIRE FRAUD

23.    From in or about March 2004 through in or about December 2014, in the Eastern District of Virginia and elsewhere, BOONE knowingly and intentionally conspired with Anthony Burfoot and others known and unknown to commit wire fraud, that is: having devised and intending to devise a scheme and artifice to defraud the citizens of the City of Norfolk of their right to honest services of a City Councilman and a Treasurer through bribery, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures and sounds for the purpose of execution such scheme and artifice to defraud.

### PURPOSE

24.    A purpose of the conspiracy was for the defendant BOONE to secretly provide cash, gifts, and other things of value to Anthony Burfoot in exchange for Anthony Burfoot performing specific official actions and other official actions on an as-needed basis, as opportunities arose, to benefit BOONE and his business interests.

### MANNER AND MEANS

25.    The manner and means by which BOONE and his conspirators, known and unknown, carried out the conspiracy included, but were not limited to the following:

     a.    BOONE provided cash, dinners, free access to a beach house, and other things of value to Anthony Burfoot; and

     b.    Anthony Burfoot engaged in official acts – and promised to engage in official acts in the future – as opportunities arose including the official acts set forth below:

          i.    Anthony Burfoot promised to use his position as City Councilman to vote in BOONE's favor on numerous City ordinances;

6

ii.    Anthony Burfoot, as City Councilman, voted in BOONE's favor on numerous City ordinances; and

iii.    Anthony Burfoot promised to assist BOONE as City Treasurer by: (a) using his relationships with Norfolk City Officials and Council members to advocate for BOONE concerning official city matters; (b) waiving penalties and interest for BOONE on property tax sales; and (c) providing BOONE with advanced notice of properties subject to tax sales.

<u>ACTS IN FURTHERANCE OF THE CONSPIRACY</u>

A.    <u>The Corrupt Relationship Between BOONE and Anthony Burfoot</u>

26.    BOONE met Anthony Burfoot at a birthday party after Burfoot was elected to City Council. Prior to Anthony Burfoot serving as a Norfolk City Councilman, BOONE had never met him and they were not friends.

27.    Starting in or about March 2004 through in or about December 2015, BOONE regularly asked Anthony Burfoot to use his official position to support BOONE's interests on Norfolk City Council matters. In exchange, Anthony Burfoot demanded and received numerous things of value including, but not limited to, cash payments, meals, assistance hosting events where Anthony Burfoot would make a profit, and free access to BOONE's beach house located on Lindbergh Avenue in Kitty Hawk, North Carolina.

B.    <u>BOONE provided things of value to Anthony Burfoot</u>

28.    Throughout the conspiracy, BOONE routinely gave Anthony Burfoot cash in increments of several thousand dollars, but typically not less than $2,500 at a time. Anthony Burfoot always demanded the payments in cash. BOONE placed the cash in an envelope and

discreetly passed the cash to Anthony Burfoot when they met in person. In response, Anthony Burfoot regularly told BOONE, "I got your back."

29.     On numerous occasions, Anthony Burfoot also asked BOONE to "loan" him a few thousand dollars, and BOONE provided these "loans" in cash. Over the course of the conspiracy, the cumulative value of these undocumented, no-interest "loans" totaled at least $20,000. Moreover, Anthony Burfoot never made payments to BOONE for these "loans," and BOONE never asked Anthony Burfoot to make payments on the "loans."

30.     On numerous occasions throughout the conspiracy, Anthony Burfoot took different friends to North Carolina to stay free of charge at BOONE's beach house located in Kitty Hawk, North Carolina. BOONE's beach house located on Lindbergh Avenue is approximately 2,100 square feet with 4 bedrooms, 3.5 bathrooms, and a pool. BOONE rented this beach house to customers for between $895 - $3,295 per week depending on the time of year. Anthony Burfoot never paid, nor offered to pay for any of his overnight or daily stays at the beach house despite the fact that his use prevented BOONE from renting the home to customers.

31.     Anthony Burfoot used BOONE's beach house so frequently that BOONE gave Anthony Burfoot a key to the beach house. Anthony Burfoot, however, had to contact BOONE prior to using the beach house to ensure that the home was available for use and not rented to customers.

32.     To conceal BOONE's ownership of the beach house, Anthony Burfoot repeatedly told friends that he, in fact, owned the beach house. Anthony Burfoot has claimed to at least three individuals who went to the beach house with him – each on separate occasions – that he, in fact, owned the beach house.

8

33.     Moreover, Anthony Burfoot's close friend, who was also a high-ranking employee of the Treasurer's office, has indicated that Anthony Burfoot regularly used BOONE's beach house, that BOONE gave Anthony Burfoot a key to the beach house, and that Anthony Burfoot "goes down there when he wants to." The friend further indicated that Anthony Burfoot referred to BOONE's beach house as "my beach house."

C.     Anthony Burfoot Promised To Perform, And Did Perform, Official Acts For BOONE

34.     Although Anthony Burfoot did not represent the Ocean View area of Norfolk, Virginia, it was in BOONE's interest to ensure Anthony Burfoot's vote for various City Ordinances that affected his extensive business interests in the City.

35.     In exchange for things of value provided to Anthony Burfoot, BOONE regularly sought Anthony Burfoot's support for important issues before City Council. During the course of the conspiracy, Anthony Burfoot assisted BOONE by ensuring that a particular individual was removed from the Board of Commissioners for the Norfolk Redevelopment and Housing Authority. Anthony Burfoot repeatedly voted in accordance with BOONE's wishes in numerous matters before council including, but not limited to:

- Special exceptions for a Boone business;

- Special exceptions for businesses that operated out of Boone's properties;

- Ordinances dealing with Boone's properties; and

- Ordinances that directly and indirectly impacted Boone's business interests.

36.     One of BOONE's primary objects in providing things of value to Anthony Burfoot was to ensure Anthony Burfoot's support for an extensive and potentially controversial mixed-use development project BOONE planned for the Ocean View area. Anthony Burfoot repeatedly promised his support for BOONE's planned development project.

9

37.  To further this conspiracy, BOONE and Anthony Burfoot regularly contacted each other via cell phone. Anthony Burfoot contacted BOONE via cell phone to arrange his overnight and day trips to BOONE's beach house, and BOONE regularly contacted Anthony Burfoot via his cell phone to discuss upcoming votes before City Council that impacted BOONE and his businesses.

38.  For example, in furtherance of the conspiracy, on or about January 7, 2012, Anthony Burfoot made an interstate telephone call from Kitty Hawk, North Carolina to BOONE who was located in Norfolk, Virginia. In or about March 2012 through April 2012, Anthony Burfoot made five more interstate calls from North Carolina and Pennsylvania to BOONE located in Norfolk, Virginia.

39.  Around that same time, BOONE asked the City of Norfolk to approve an encroachment to permit him to infringe into the right-of-way on Atlans street with a wide asphalt driveway for property located on Atlans Street. An encroachment is an object or structure that infringes into the City of Norfolk's rights-of-way or property. The Norfolk City Council must approve all encroachments.

40.  Prior to the vote, BOONE asked Anthony Burfoot for his support for the project. Anthony Burfoot demanded thousands of dollars in cash prior to the vote. BOONE paid Anthony Burfoot between $5,000 and $10,000 in cash prior to the vote.

41.  On or about June 26, 2012, Anthony Burfoot voted to approve an ordinance to allow BOONE to encroach into the City of Norfolk's right-of-way on Atlans Street.

D.  BOONE And Anthony Burfoot Had One Disagreement

42.  From in or about early 2011 through in or about July 2012, BOONE asked Anthony Burfoot for his support on an issue that impacted his restaurants. Because BOONE's

10



restaurants pre-dated Norfolk City Ordinances requiring special exceptions, his establishments were permitted to sell alcohol until 2:00 a.m. on the weekends.

43.     In or about February 2011, two restaurants in Ocean View sought to amend their special exceptions to enable them to stay open until 1:00 a.m. on the weekends. BOONE asked Anthony Burfoot to oppose this request as an increase in competition would have a direct impact on BOONE's business interests. In accordance with BOONE's request, at first, Anthony Burfoot expressed opposition to amendments to the special exceptions. Lacking enough votes on City Council to pass the amendments, the applicants withdrew their requests without presenting them for a vote.

44.     A year later, one business renewed its request to stay open one extra hour on the weekends. On the day of the vote, on July 10, 2012, at approximately 9:44 a.m., BOONE and Anthony Burfoot had a 14-minute phone call. During the call, Anthony Burfoot assured BOONE that he had the votes to defeat the restaurant's special exception request and assured BOONE that he would take care of it.

45.     At the City Council meeting later that day, Anthony Burfoot changed his mind and voted in favor of the restaurant's request to stay open for an extra hour on the weekends.

46.     Immediately following the City Council meeting, BOONE and Anthony Burfoot participated in 6 telephone calls with the final call lasting 12 minutes. BOONE was furious, the conspirators got into a heated argument and, as a result, did not speak for a period of time. During this time, BOONE did not give Anthony Burfoot any things of value.

47.     In or about early 2013, Anthony Burfoot's close friend contacted BOONE to settle the dispute between BOONE and Anthony Burfoot. BOONE took Anthony Burfoot and the friend to dinner during which BOONE and Anthony Burfoot resolved their dispute. BOONE



11

reconciled with Anthony Burfoot because he needed Burfoot's support for future real estate projects. After this meeting, BOONE continued to provide things of value to Anthony Burfoot including, but not limited to, allowing Anthony Burfoot to use his beach house for free.

E.   Anthony Burfoot Promised To Perform Favors For Boone As The City Treasurer

48.   In early 2013, Anthony Burfoot informed BOONE that he intended to run for City Treasurer. BOONE expressed concern that Anthony Burfoot would no longer be in a position to assist BOONE and his business interests.

49.   Anthony Burfoot assured BOONE that he could continue to help BOONE's interests as City Treasurer in three ways. First, Anthony Burfoot assured BOONE that he would still have influence with City Council members and City administrators as it related to City matters that impacted BOONE's businesses. Second, Anthony Burfoot explained that he could waive penalties and interest for BOONE on property taxes. Finally, Anthony Burfoot promised to give BOONE detailed information about properties that would be subject to tax sales which would give BOONE the opportunity to purchase the properties prior to auction.

50.   After Anthony Burfoot's assurances that he would continue to be in a position of influence, BOONE continued to provide Anthony Burfoot with things of value through December 2015.

51.   In or about early 2015, BOONE had dinner with Anthony Burfoot and Anthony Burfoot's close friend who was also a high-ranking employee at the Treasurer's Office. During the dinner, Anthony Burfoot told BOONE that federal authorities were investigating the beach house. Anthony Burfoot also told BOONE that he believed that federal investigators thought that Burfoot actually owned the home.

12

## OTHER RELEVANT CONDUCT

52.     From in or about 2002 through in or about 2012, BOONE knowingly and

intentionally engaged in a corrupt *quid pro quo* relationship with another high-ranking Norfolk

City Official wherein BOONE provided cash and other things of value in exchange for that

public official using his position to benefit BOONE.

53.     In or about early 2015, BOONE gave an undisclosed, interest-free, undocumented

loan of at least $5,000 to another high-ranking employee of the Treasurer's office.

<div style="margin-left:40%">

Dana J. Boente
United States Attorney

By: _Melissa E. O'Boyle_

Melissa E. O'Boyle
Assistant United States Attorney

</div>



13

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, RONALD W. BOONE, SR., and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

RONALD W. BOONE, SR.
Defendant

I am RONALD W. BOONE, SR.'s attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Jon M. Babineau
Counsel for the Defendant

Edward A. Fiorella
Counsel for the Defendant

14